*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANTHONY TERREL WILSON,

        Defendant-Appellant.

UNPUBLISHED
June 27, 2024

No. 360117
Berrien Circuit Court
LC No. 2021-001084-FC

Before: LETICA, P.J., and BORRELLO and RICK, JJ.

PER CURIAM.

Defendant appeals as of right his convictions of delivery of a controlled substance causing death, MCL 750.317a, and delivery/manufacture of a controlled substance (less than 50 grams; second offense), MCL 333.7401(2)(a)(*iv*) and MCL 333.7413. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to serve 40 to 60 years' imprisonment for the conviction of delivery of a controlled substance causing death, and 10 to 40 years' imprisonment for the conviction of delivery/manufacture of a controlled substance. We affirm.

## I. FACTUAL BACKGROUND

Defendant's convictions arise out of the sale of fentanyl to Matthew Green[1] and Sidney Woodman,[2] two of his regular buyers. At trial, Woodman, who was Green's girlfriend, testified that she had been purchasing fentanyl from defendant daily for about a year. On October 31, 2020, Green arranged for a delivery at the Briarwood Apartments in Benton Township. Woodman said

---

[1] Green pled guilty to manslaughter, MCL 750.321, as a third-habitual offender, MCL 769.11, in the victim's death. *People v Green*, Ingham County Circuit Court Docket No. 2021-000301-FC. This Court denied Green's application for leave to appeal. *People v Green*, unpublished order of the Court of Appeals, entered February 28, 2024 (Docket No. 369330), lv pending.

[2] Woodman, who was initially charged with delivery of fentanyl causing death, pled guilty to the lesser offense of delivery of fentanyl in the victim's death in exchange for providing truthful testimony against defendant and Green.

she would purchase fentanyl by meeting defendant, who drove a black Cadillac, in the apartment's back parking lot. That night, the victim, Green's friend, drove both Green and Woodman to the apartment's parking lot. Woodman, using cash provided by Green, got into the passenger seat of defendant's car and exchanged the money for fentanyl. She returned to the victim's car and gave the fentanyl to Green, who put it in his pocket.

At around 4:00 or 5:00 a.m. on November 1, 2020, Green and Woodman shared some of the fentanyl with the victim. After the victim injected what Woodman believed was only a small amount, he "almost instantly fell out, like sleeping." Woodman testified that "we tried giving him CPR and splashing cold water on him, trying to wake him up, but it wasn't working so we ended up calling an ambulance." The victim died and Woodman later identified defendant as the individual responsible for providing the fentanyl that killed the victim.

Before trial, the prosecutor moved to consolidate five other cases with this one or to present the facts underlying those cases as other-acts evidence during defendant's trial. The trial court denied the prosecutor's request for consolidation, but allowed the underlying facts to be used as other-acts evidence. During trial, the prosecutor presented testimony from various police officers that defendant delivered fentanyl to an undercover officer four times and left the scene of an accident, after which 31 baggies of fentanyl were found beneath an Audi. Inside the Audi, police also found a scale and paperwork belonging to defendant. Defendant was carrying over $2,000 in cash.

The Berrien County medical examiner testified that fentanyl was a substantial cause of the victim's death. Finally, the prosecutor introduced testimony from Detective Michael Fry, a police strategic operations and intelligence analyst, regarding phone location data that connected Woodman and Green to the area where the drug sale was completed.

The jury convicted defendant. After sentencing, he filed a postconviction motion for acquittal on the charge of delivery of a controlled substance causing death, for a new trial, for resentencing, and for disclosure of the plea agreement. The trial court denied his motion. This appeal followed.

II. ANALYSIS

A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the prosecutor failed to provide sufficient evidence that the fentanyl he delivered caused the victim's death. We disagree.

We review a challenge to the sufficiency of the evidence by reviewing the evidence de novo. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). We view the evidence "in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proved beyond a reasonable doubt." *Id.*; see also *Jackson v Virginia*, 443 US 307, 324; 99 S Ct 2781; 61 L Ed 2d 560 (1979).

In a criminal case, due process requires that a prosecutor introduce evidence sufficient to justify a rational trier of fact in finding a defendant guilty beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 513-514; 489 NW2d 748 (1992). The prosecutor does not have to negate

every reasonable theory of innocence because the prosecutor is only bound to prove the elements of the offense beyond a reasonable doubt and "in the face of whatever contradictory evidence the defendant may provide." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (quotation marks and citation omitted). When reviewing challenges to the sufficiency of the evidence, we must not interfere with the fact-finder's role in deciding the weight and credibility to give to a witness's testimony, "no matter how inconsistent or vague that testimony might be." *People v Mehall*, 454 Mich 1, 6; 557 NW2d 110 (1997); see also *People v Lemmon*, 456 Mich 625, 646-647; 576 NW2d 129 (1998). "The standard of review is deferential: a reviewing court is required to draw all inferences and make credibility choices in support of the jury verdict." *Nowack*, 462 Mich 400.

"Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of the crime." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (quotation marks and citation omitted). We must consider all the inferences that can be fairly drawn from the evidence because, when evidence is relevant and admissible, "it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). In such cases, it is for the fact-finder alone to "determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *Id*.

The jury convicted defendant of delivery of a controlled substance causing death in violation of MCL 750.317a, which provides:

> A person who delivers a schedule 1 or 2 controlled substance, other than marihuana, to another person in violation of section 7401 of the public health code, 1978 PA 368, MCL 333.7401, that is consumed by that person or any other person and that causes the death of that person or other person is guilty of a felony punishable by imprisonment for life or any term of years.

In other words, the elements of delivery of a controlled substance causing death are "(1) delivery to another person, (2) of a schedule 1 or 2 controlled substance (excluding marijuana), (3) with intent to deliver a controlled substance . . . (4) consumption of the controlled substance by a person, and (5) death that results from the consumption of the controlled substance." *People v Dumback*, 330 Mich App 631, 641; 950 NW2d 493 (2019) (quotation marks and citation omitted).

Fentanyl is a Schedule 2 controlled substance. MCL 333.7214(b). Delivery of a controlled substance causing death is a general intent crime and requires only the general intent to deliver a Schedule 1 or 2 controlled substance, not the specific intent to cause death. *People v Plunkett*, 485 Mich 50, 60; 780 NW2d 280 (2010). The statute is designed to "punish[] an individual's role in placing the controlled substance in the stream of commerce, even when that individual is not directly linked to the resultant death." *Id*. "In assessing criminal liability for some harm, it is not necessary that the party convicted of a crime be the sole cause of that harm, only that he be a contributory cause that was a substantial factor in producing the harm." *People v Bailey*, 451 Mich 657, 676; 549 NW2d 325 (1996). Our Supreme Court has further explained:

The criminal law does not require that there be but one proximate cause of harm found. Quite the contrary, all acts that proximately cause the harm are recognized by the law.

> If a certain act was a substantial factor in bringing about the loss of human life, it is not prevented from being a proximate cause of this result by proof of the fact that it alone would not have resulted in death, nor by proof that another contributory cause would have been fatal even without the aid of this act. [*Id.*, quoting Perkins & Boyce, Criminal Law (3d ed) at 783.]

In ruling on defendant's motion for a new trial, seeking a directed verdict of acquittal, the trial court considered all the evidence and properly determined that "a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979). Evidence was presented that Green arranged to purchase fentanyl from defendant. The victim drove Green and Woodman to the apartment parking lot to meet with defendant as arranged. Green gave money to Woodman and she used it to buy the fentanyl from defendant. Woodman gave the fentanyl to Green. Green later gave some of the fentanyl to the victim, who died quickly after injecting it using the same needle as Green had.

Evidence was also presented to show that the fentanyl played a substantial role in the victim's death. Although the victim had used methamphetamine earlier in the night, Woodman described the victim as alert and moving normally. Several hours later, the victim injected himself with the fentanyl defendant provided and the victim almost immediately lost consciousness.

Considering the short time between the victim's injection of fentanyl and his loss of consciousness, the medical examiner, who performed an autopsy, determined that the victim's fentanyl use was a substantial factor in his death. Specifically, the victim's cause of death was determined to be "the combined toxic effects of alprazolam,[3] fentanyl, and methamphetamine." The medical examiner testified that the victim had "very heavy lungs,"[4] which were indicative of pulmonary edema, a common result of drugs that cause respiratory depression, such as fentanyl. The medical examiner further testified regarding the combination of fentanyl with alprazolam, which has a "synergistic" effect on progressing respiratory depression, and attributed this combination and resulting effect to the victim's death.

And evidence was presented that methamphetamine is a stimulant and that the common cause of a drug overdose caused by methamphetamine is cardiac arrhythmia. The medical examiner described the respiratory depression that is caused by fentanyl use and how that, combined with the effects of methamphetamine, could cause sudden cardiac arrhythmia. Although evidence was presented that both methamphetamine and fentanyl could have caused the victim's

---

[3] Alprazolam, commonly known as Xanax, is an anti-anxiety drug that soothes nerves and relaxes muscles. Although it is a prescription medication, the victim did not have a prescription for it.

[4] The victim's lungs weighed 1,746 grams, about 1,000 grams more than they should.

death independently, evidence was also presented that deaths that result from solely methamphetamine consumption look different because there would not be "heavy lungs" or other findings indicative of respiratory depression.

On this record, a rational jury could conclude that the evidence presented established that the victim's use of the fentanyl, which defendant had earlier sold to Woodman and Green was a substantial factor in his death. Accordingly, the defendant's claim that the evidence was insufficient to establish his guilt beyond a reasonable doubt fails.

## B. MRE 404(b)

Defendant next claims that the trial court abused its discretion when it admitted evidence of other bad acts. Although we agree in part, we conclude that any error was not outcome determinative.

Before trial, the prosecution filed a motion under MCR 6.120 to consolidate six separate cases involving defendant for trial. Those cases were:

- Docket No. 2021-001084-FC, the two counts charged in the instant case,

- Docket No. 2020-003902-FH, four counts of delivery of fentanyl within 1,000 feet of a school, MCL 333.7410(2), and an additional count of maintaining a drug vehicle, MCL 333.7405(1)(d), arising from four separate deliveries of fentanyl to an undercover officer,

- Docket No. 2020-0003899-FH, counts for operating while intoxicated causing death, MCL 257.625(4)(a), operating without a license causing death, MCL 257.904(1), leaving the scene of an accident causing death, MCL 257.617(3), and possession with intent to deliver fentanyl, as a second offense, MCL 333.7401(2)(a)(*iv*) and 333.7413, involving a vehicle/motorcycle accident where 31 individually wrapped baggies of fentanyl were found in a larger baggie,

- Docket No. 2021-000068-FH, counts for larceny between $1,000 and $20,000, MCL 750.356(3)(a), and tampering with an electronic monitoring device, MCL 771.3f,

- Docket No. 2021-000137-FH, a count of absconding on bond, MCL 750.199a, arising from the charges listed in Docket No. 2020-003902-FH, and

- Docket No. 2021-000202-FH, a count of absconding on bond, MCL 750.199a, arising from the charges listed in Docket No. 2021-000068-FH.

Alternatively, the prosecution provided notice that it intended to admit evidence of conduct in the five other cases in this case under MRE 404(b) to show defendant's "intent, scheme, plan, system in doing an act, identity, and state of mind (consciousness of guilt)."

Defense counsel failed to respond to the prosecution's motion in writing. He later asserted that he had not received the prosecution's motion/notice until the morning of the hearing after

learning of its existence the previous week and inquiring about it. As to defendant's five other cases, defendant had retained counsel, who objected to both the consolidation and the admission of the other-acts evidence.

At the hearing on the prosecution's motion, it appears that the trial court did not have three of the case files, including the one pertaining to the instant case. After opining that the other-acts evidence would be admissible without any elaboration, the court voiced concern over potential jury confusion and the court's ability to craft a verdict form given the number of charges involved if the court opted to consolidate the matters. As the defense continued to object, the prosecution offered to try the instant case separately while maintaining its ability to present the other-acts evidence. The trial court ultimately determined that the five other cases would be consolidated; however, it would try the instant case separately and permit the prosecution to present evidence regarding those acts under MRE 404(b). The trial court reasoned that the "completely separate pattern of facts" was unfairly prejudicial, causing confusion and delay, particularly given that the absconding charges arose from the other cases. Although defense counsel in the instant case requested the opportunity to further object, the trial court observed that counsel's on-the-record objection was sufficient and it determined that the prosecution's MRE 404(b) notice was timely. The trial court later entered an order consistent with its decision.

At trial, defense counsel touched upon the other-acts evidence during voir dire and explained that defendant was not on trial for those matters. And, in the prosecution's opening statement, it referenced defendant's fentanyl sales to an undercover officer and the 31 individually wrapped baggies containing fentanyl found during the investigation of an accident involving a vehicle and a motorcycle. According to the prosecution, the other-acts evidence demonstrated that defendant knew he was delivering a controlled substance.[5]

During trial, the prosecution presented evidence of the conduct underlying only two of the five separate cases as other-acts evidence. The first case involved four separate fentanyl deliveries defendant made to a single undercover police officer. The second case pertained to a baggie containing 31 individually-wrapped baggies of fentanyl that the police discovered under a silver Audi after a traffic accident.

---

[5] The prosecution's MRE 404(b) notice did not include its intention to use this evidence to establish defendant's knowledge of the nature of the substance delivered.

The four controlled buys made to the undercover police officer are summarized below:

| | DATE | LOCATION | VEHICLE INVOLVED / OTHER INFORMATION | AMOUNT | COST |
|---|---|---|---|---|---|
| First buy | 10/9/20 | 243 Parker Ave[6] | black Charger driven by a then-unknown male with defendant as a passenger; after the hand-to-hand transaction, the Charger parked in the back of the Briarwood Apartments | .95 grams | $80 |
| Second buy | 11/5/20 | 243 Parker Ave | black Cadillac, the license plate from the Charger was on the Cadillac; defendant was alone; after the hand-to-hand transaction, the Cadillac was seen at the Briarwood Apartments | .9 grams | $80 |
| Third buy | 11/9/20 | 243 Parker Ave | black Cadillac; defendant was alone; hand-to-hand transaction; unknown where Cadillac was parked, but it was seen leaving the Briarwood Apartments and heading to 243 Parker Ave | .9 grams | $80 |
| Fourth buy | 11/10/20 | 243 Parker Ave | identical to 11/9/20 transaction | .44 grams | $40 |

During each incident, the undercover officer called 269-247-1821 (defendant's cell phone number) and arranged to purchase fentanyl from defendant.[7] Thereafter, defendant engaged in hand-to-hand deliveries with the undercover officer. A videotape from the November 5, 2020

---

[6] This address is near a high school and approximately two miles from the Briarwood Apartments, where Green and Woodman obtained the fentanyl that caused the victim's death. Defendant lived at his mother's home, approximately one and one-half miles from the Briarwood Apartments.

[7] This was the same cell phone number used to purchase the fentanyl that led to the victim's death in this case.

transaction was played for the jury during defendant's trial. It depicted a swift interaction, but no actual exchange of fentanyl for prerecorded monies. Laboratory reports from the sales were also admitted into evidence.

The second case involved a vehicle/motorcycle accident, which occurred in the area of the Briarwood Apartments on November 16, 2020, fifteen days after the victim in the instant case died. During defendant's trial, the prosecution did not disclose that the motorcyclist died. However, there was testimony that the police suspected defendant left the accident site given his proximity to a silver Audi with heavy damage found backed into a parking space in the southwest lot of the Briarwood Apartments. A photograph depicting the damage to the Audi was admitted. Defendant appeared to be intoxicated and had visible shattered glass on his clothing. Notably, in front of the Audi's right-rear passenger tire, on top of oil that had leaked from the car, the police located a baggie containing 31 individually wrapped baggies of fentanyl, weighing 3.387 grams. Inside the Audi, the police found a portable electronic digital scale containing fentanyl residue, two cell phones, a bottle of alcohol, and a receipt for mechanical work on the Audi dated the day of the accident. The receipt contained defendant's name, address, and telephone number. One of the two cell phones located in the Audi was a flip phone with the telephone number 269-247-1821, the same contact number for defendant used by Green and Woodman in this case as well as the undercover officer. Defendant also had a carabiner key ring that contained a key for the Audi with a blue mechanical tag with the name "Wilson" on it, a Cadillac key fob, and a Toyota key. After defendant was arrested for the November 16, 2020 accident, the police asked defendant whether the Cadillac key fob belonged to the black Cadillac parked in his mother's driveway. Defendant denied that it did; however, the police later drove to defendant's mother's house and confirmed that the Cadillac key fob engaged the black Cadillac's locking mechanisms and flashed its lights. Additionally, the police seized $2,152 and some change from defendant after his arrest. Defendant told the police that he did not have a job, but raked lawns in exchange for a $60 cash payment. In the last two weeks, defendant estimated that he had raked six lawns, and thus, he failed to account for his possession of the monies seized.

In closing argument, the prosecution argued that defendant made his livelihood "preying" on others. More specifically, defendant dealt drugs, and, by extension, death. With every sale, defendant "release[d] a little more destruction in our community." The victim's death did not end defendant's business; rather, "[h]e just kept dealing." In fact, defendant sold to the Southwestern Enforcement Team (SWET) before the victim's death,[8] and afterward, he was ready to sell the 31 baggies at the Briarwood Apartments. The prosecution also urged the jury to conclude that defendant knew he was dealing fentanyl based on the other-acts evidence.

In his closing argument, defense counsel contended that defendant was not charged with committing the other acts discussed during this trial. He urged the jurors to follow the trial court's instruction regarding the appropriate uses for the other-acts evidence and to concentrate on the evidence pertaining to the October 31st event. Defense counsel further contended that there was no evidence that Woodman and Green actually met with defendant on October 31, 2020. And

---

[8] The undercover officer was a member of SWET and his first purchase occurred before the victim's death.

counsel further suggested that Woodman was shielding her friend, who was her alternate drug source.  Finally, counsel maintained that it was implausible that Woodman and Green would not have used the fentanyl in the hours that passed between the time they purchased it and the time they consumed it.

In rebuttal, the prosecutor argued that the other-acts evidence could be used to show that defendant was the person who delivered the fentanyl to Green and Woodman.  The transaction was comparable to the videotaped transaction that defendant had with the undercover officer.  The prosecutor further noted that in addition to the prior deals, the same phone number was used in the transactions with the undercover officer.  The prosecutor added that the phone was on defendant,[9] who was driving the same car[10] at the same place.[11]

As requested by defense counsel before the parties' closing arguments, the trial court provided the jury with a limiting instruction regarding the use of the other-acts evidence:

> You have heard evidence that was introduced to show that the Defendant committed other improper acts for which he is not on trial.  If you believe this evidence you must be very careful to only consider it for certain purposes.  You may only think about whether this evidence tends to show that the Defendant specifically meant to deliver a controlled substance, that the Defendant knew that the things found in his possession -- that he knew what they were, that the Defendant acted purposefully, that is not by accident or mistake, or because he misjudged the situation, that he used a planned system or characteristic scheme that he has used before or since, and that he committed the crime the Defendant is charged with.
>
> You must not consider this evidence for any other purpose.  For example, you mist [sic] not decide that it shows the Defendant is a bad person, or that he is likely to commit crimes.  You must not convict the Defendant here because you think he is guilty of other bad conduct.  All the evidence must convince you beyond a reasonable doubt that the Defendant committed the alleged crimes, or you must find him not guilty.

After deliberating for over an hour, the jury returned its guilty verdicts.

On appeal, defendant contends that the trial court improperly admitted the other-acts evidence to establish his intent or to show that he acted in conformity with his plan, system, or

---

[9] The cell phone was found in the Audi.

[10] Defendant drove the Cadillac on November 5, 9, and 10, but not on October 9 or November 16, even though he had the Cadillac key fob on the carabiner clip.

[11] While the November 16 incident occurred near the Briarwood Apartments, the transactions with the undercover officer occurred at a different location, even if the Cadillac was seen at the Briarwood Apartments either before or after the last three transactions.

scheme. The prosecution asserts that the trial court did not abuse its discretion in admitting the other-acts evidence for establishing defendant's identity as the perpetrator or his plan, system, or scheme, given their commonalities, including the use of defendant's phone number, the fentanyl involved, the use of the black Cadillac, and their connection to the Briarwood Apartments.

This Court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. *People v Hoskins*, 342 Mich App 194, 200; 993 NW2d 48 (2022). "An abuse of discretion occurs when the trial court's decision falls outside the range of principled outcomes." *People v Olney*, 327 Mich App 319, 325; 933 NW2d 744 (2019) (quotation marks and citation omitted). "A trial court also necessarily abuses its discretion when it makes an error of law." *People v Al-Shara*, 311 Mich App 560, 566; 876 NW2d 826 (2015). Finally, "a trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *People v Cameron*, 291 Mich App 599, 608; 806 NW2d 371 (2011) (quotation marks and citation omitted).

MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

The rule is one of inclusion and allows for the admission of other-acts evidence for any relevant purpose other than to establish propensity and action in conformity therewith. *People v VanderVliet*, 444 Mich 52, 63-65; 508 NW2d 114 (1993). The rule prohibits the admission of other-acts evidence to establish propensity to avoid the danger of conviction based on a defendant's history of misconduct. *People v Starr*, 457 Mich 490, 495; 577 NW2d 673 (1998) (quotation marks and citation omitted).

When determining whether other-acts evidence may be admitted at trial consistent with MRE 404(b)(1), the trial court must first determine whether the proponent has offered the evidence for a proper purpose, meaning for something other than an improper character theory. *VanderVliet*, 444 Mich at 74 (quotation marks and citation omitted). There are several relevant bases for the admission of other-acts evidence: such as evidence may be admitted to "prove motive, opportunity, intent preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident." MRE 404(b)(1).

Next, the trial court must determine whether the proposed evidence is relevant under MRE 402, as enforced through MRE 104(b), to an issue or fact of consequence. *VanderVliet*, 444 Mich at 74 (quotation marks and citation omitted). This requires the trial court to "closely scrutinize the logical relationship between the other-acts evidence and the fact in issue." *People v Orr*, 275 Mich App 587, 589; 739 NW2d 385 (2007). Evidence will not be relevant if the proponent does not show that a jury could reasonably find that the defendant committed the other

act by a preponderance of the evidence. *People v McFarlane*, 325 Mich App 507, 530; 926 NW2d 339 (2018).

Third, the trial court must apply MRE 403 and determine whether the danger of undue prejudice substantially outweighs the probative value of the other-acts evidence. *VanderVliet*, 444 Mich at 74-75. "Evidence presents the danger of unfair prejudice when it threatens the fundamental goals of MRE 403: accuracy and fairness." *People v Vasher*, 449 Mich 494, 501; 537 NW2d 168 (1995). The proffered evidence would be unfairly prejudicial if it presents a danger that marginally probative evidence will be given undue or preemptive weight by the jury or it would be inequitable to allow use of the evidence. *People v Lowrey*, 342 Mich App 99, 109; 993 NW2d 62 (2022); *People v McGhee*, 268 Mich App 600, 613-614; 709 NW2d 595 (2006). "[W]hether the probative value of evidence is substantially outweighed by its prejudicial effect is best left to a contemporaneous assessment of the presentation, credibility, and effect of the testimony." *People v Waclawski*, 286 Mich App 634, 670; 780 NW2d 321 (2009).

Lastly, the trial court may, upon request, provide a limiting instruction consistent with MRE 105. *VanderVliet*, 444 Mich at 75. This Court has held that a trial court may safeguard a defendant's rights when it instructs the jury on the proper use of other-acts evidence that was admitted at trial. *People v Roper*, 286 Mich App 77, 106; 777 NW2d 483 (2009).

We begin by recognizing that it is concerning that the trial court conflated its analysis regarding the question of whether the six cases pending against defendant should be consolidated under MCR 6.120(B) and its other-acts analysis under MRE 404(b). In the future, we encourage the trial court to separately address such matters.

Curiously, defendant neither addresses the trial court's decision to admit the evidence to establish his identity or state of mind pursuant to the prosecution's MRE 404(b) notice nor the trial court's limiting instruction that the other-acts evidence could be used to establish defendant's knowledge of the substance delivered or that defendant acted purposefully, that is not by accident, mistake or because he misjudged the situation. Defendant's failure to challenge the admission of the other-acts evidence for these separate purposes in his brief constitutes abandonment. *People v Knapp*, 244 Mich App 361, 374 n 4; 624 NW2d 227 (2001).

"[A] defendant's general denial places all the elements of the charge at issue." *People v Sabin (After Remand)*, 463 Mich 43, 60; 614 NW2d 888 (2000). However, this "does not automatically render the other-acts evidence relevant in a particular case" because "[t]he trial court must still determine whether the evidence, under a proper theory, has a tendency to make the existence of a fact of consequence in the case more or less probable than it would be without the evidence." *Id*.

Evidence of misconduct similar to that charged is logically relevant to show that the charged act occurred if "the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they were manifestations of a common plan, scheme, or system." *Sabin (Aft Rem)*, 463 Mich at 63. Remoteness in time of the other act relates to the weight of the evidence rather than its admissibility. *People v Brown*, 294 Mich App 377, 387; 811 NW2d 531 (2011). A "general similarity between the charged and uncharged acts does not, however, by itself, establish a plan, scheme, or system used to commit the acts," but "logical relevance is not limited

-11-

to circumstances in which the charged and uncharged acts are part of a single continuing conception or plot. . . ." *People v Dobek*, 274 Mich App 58, 90; 732 NW2d 546 (2007) (quotation marks, citation, and alterations omitted).

In this case, defendant was separately charged with four counts of fentanyl sales to an undercover police officer.[12] The similarities between the undercover buys, including calling defendant on his cell phone to arrange a fentanyl purchase, defendant arranging a location to meet, defendant arriving alone in a black Cadillac on three of four occasions, and defendant engaging in a hand-to-hand transfer of fentanyl for cash, demonstrated that defendant's actions were part of a common scheme or plan to engage in fentanyl delivery, rather than simply proving defendant's propensity to commit such acts. Thus, this evidence was admitted for a proper purpose. See *VanderVliet*, 444 Mich at 74. Moreover, evidence was presented that Woodman purchased a half gram of fentanyl in the instant case and this was consistent with testimony that the undercover officer purchased 0.44 grams of fentanyl during one purchase and 0.9 grams of fentanyl during the other three. Thus, three of the undercover buys were sufficiently similar and shared a concurrence of common features to the charged act of delivery of a controlled substance (fentanyl) causing death. The other-acts evidence supported an inference that defendant employed the same system, plan, or scheme in this case, making it relevant. See *People v Steele*, 283 Mich App 472, 479-480; 769 NW2d 256 (2009).

Regarding the defendant's possession of the 31 individual baggies of fentanyl, a digital scale containing fentanyl residue, two cell phones, and over $2,000 after the traffic accident, however, this other-acts evidence did not establish defendant's plan, system, or scheme. It was vastly different than the delivery involving a small amount of fentanyl on the night of Green and Woodman's purchase and an Audi, not a Cadillac, was involved.

Defendant also argues that the other-acts evidence failed MRE 403's balancing test. As previously explained, the trial court must apply MRE 403 and determine whether the danger of undue prejudice substantially outweighs the probative value of the other-acts evidence. *VanderVliet*, 444 Mich at 74-75. As to the three deals with the undercover officer, their probative value was not substantially outweighed by the danger of their prejudicial effect given the trial court's limiting instruction, which the jury is presumed to have followed. *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998); *People v Mullins*, 322 Mich App 151, 173; 911 NW2d 201 (2017). On the other hand, the evidence presented regarding defendant's alleged intoxicated driving and hit-and-run of a motorcyclist was extremely prejudicial. Although the motorcyclist's death was not disclosed, the jury was presented with evidence that defendant's Audi incurred heavy damage, that defendant denied his involvement in the accident despite having shattered glass on his person and his proximity to the Audi containing recent repair paperwork in his name, that defendant further lied about the Cadillac key fob not engaging the black Cadillac parked in his mother's driveway, and that defendant was dealing significant amounts of fentanyl, possessed an electronic digital scale, and had over $2,000 in cash.

---

[12] Defendant was also charged with maintaining a drug vehicle; however, the specific charges were not identified and only the undercover buys were detailed.

When other-acts evidence is improperly admitted, an appellate court applies harmless-error review. *People v Denson*, 500 Mich 385, 409; 902 NW2d 306 (2017). "[A] preserved nonconstitutional error is presumed not to be ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict." *Id*. (quotation marks and citation omitted.) The reviewing court must "focus on the nature of the error and assess its effect in light of the weight and strength of the untainted evidence." *Id*. at 409-410 (quotation marks, citation, and alternations omitted).

At trial, Woodman testified she was charged with delivery causing death in the victim's death. She negotiated a plea deal to a lesser charge in exchange for providing truthful testimony against defendant and Green.

Since 2018, Woodman had been a fentanyl user. In October 2020, defendant had been Woodman's drug dealer for about a year,[13] and defendant was also Green's drug dealer. Woodman bought fentanyl from defendant daily. Defendant also sold heroin. During that same time, Woodman also used methamphetamine daily, obtaining it from Green's source. The fentanyl purchases usually occurred in the back parking lot of the Briarwood Apartments with defendant in a black Cadillac. Typically, Woodman and Green would either call or text to set up a purchase.

On October 31, 2020, Woodman and Green were at a friend's house in Coloma. The victim, who lived in Watervliet, came and picked them up. The victim's friend Teresa[14] was with him. Although the victim wanted methamphetamine, Green and Woodman planned to pick up fentanyl from defendant. Using Green's phone,[15] Green and Woodman setup a deal with defendant at the Briarwood Apartments. They drove straight from Coloma to the Briarwood Apartments in Benton Township. Defendant was not there when they arrived so they went to the liquor store to get money from an ATM before returning to the Briarwood Apartments. Defendant was parked in the back in his black Cadillac. Woodman completed the transaction, giving defendant the money for the fentanyl. When Woodman returned to the victim's car, she gave the fentanyl to Green, who put it in his pocket.

They then returned to the victim's house. Once there, Green sold the victim some methamphetamine, which the victim and Woodman used.

They did not use the fentanyl because Green's preferred method for consuming was to inject it via needle and Green and Woodman, who were homeless, and did not have a needle. After an hour or two at the victim's house, Green's friend Lisa picked up Woodman and Green. At

---

[13] In October 2020, Woodman had two drug dealers. One was defendant; the other, an unnamed friend of Woodman's. This friend was Woodman's second choice after defendant. Woodman's friend lived in Benton Heights on the other side of Benton Township and Woodman only bought from defendant in the Briarwood Apartments area.

[14] No last name was provided for Teresa.

[15] Woodman's cell phone did not work.

about 2:00 or 3:00 a.m., they obtained a needle from one of Green's friends. Lisa dropped Green and Woodman off at the victim's house at about 5:00 a.m. on November 1, 2020.

Green cut the fentanyl with a card and shared about one-tenth of it with the victim. The remainder was divided between Green and Woodman. Woodman snorted the fentanyl. Green injected his portion of the fentanyl. The victim then used Green's needle to inject the fentanyl into himself. The victim "instantly fell out like [he was] sleeping."

Green used the victim's phone to call for an ambulance at 5:55 a.m., after Green and Woodman failed to resuscitate the victim. Woodman hid in the victim's basement because she had warrants out for her arrest. She left later that day.

In the interim, a deputy arrived at the victim's house in response to Green's 911 call. The deputy spoke with Green and Teresa. The victim was pronounced dead at 6:37 a.m. on November 1, 2020.

That same day, another one of the victim's friends found Green's and the victim's cell phones wrapped in a jacket in a pile on the floor. The victim's father also discovered a note that said they were performing resuscitative measures for approximately forty minutes. The victim's father turned the phones over to the police.

Detective Michael Fry, who was qualified as an expert in cellular record analysis and historical device placement, confirmed Woodman's testimony regarding the communications and travels that occurred. Detective Fry had defendant's, Green's, and the victim's cell phone records, which were admitted as exhibits. Detective Fry also had Green's and the victim's cell phones. Detective Fry prepared a report of the contacts between defendant's and Green's phones on October 31, 2020, through the time of delivery, which was admitted as an exhibit.

Detective Fry testified that at 6:01 p.m., Green's phone texted defendant's phone:

[H]ey, I got $100 for the clear. I haven't had any boy at all, my guy. I am trying to pull something else together real fast, but at work if you can do something on boy[,] I'll take care of it next time out, but I'm trying to get case or hopefully I don't need to, but where am I going?

In Detective Fry's experience, "clear" and "boy" were "common drug talk" terms. At 6:05 p.m., Green's phone sent another text to defendant's phone: "[L]et me know, but I got the $100 for the [emoji of an] eight-ball." At 6:28 p.m., Green's phone called defendant's phone for 29 seconds. Green's phone was in Coloma; defendant's phone was in the area of the Briarwood Apartments. Green's and the victim's phones left the Coloma/Watervliet area at the exact same time. At 6:29 p.m., Green called defendant again for 21 seconds. At 7:01 p.m., Green's phone texted defendant's phone that Green was "coming through Riverside now." At 7:08 p.m., defendant's phone messaged back "okay." Green's phone then called defendant's phone, but it appeared that the six-second call did not likely go through and went directly to voicemail. Green's phone again called defendant's phone; this time for 27 seconds. Defendant's phone was still down by the Briarwood Apartments; however, Green's phone was moving away from Coloma, consistent with him driving on I-94 toward Benton Harbor. At 7:11 p.m., Green's phone sent defendant's phone

a text that he was "on M-139, so pulling up in, like, three minutes." At 7:30 p.m., Green's phone texted defendant's phone: "ATM don't work. [] I got to go to Meijer."

At 7:52 p.m., Green's phone called defendant's phone for 53 seconds. Green was in the area of I-94 and the Briarwood Apartments. Defendant's cell phone had moved toward the west side of town closer to St. Joe. At 7:57 p.m., Green's phone sent defendant's phone a message that Green was "pulling in."

At 7:59 p.m., Green's phone called defendant's phone for 35 seconds. Green's cell phone was connecting with a cell tower consistent with Green being at the Briarwood Apartments. At 7:59 p.m., Green's phone texted defendant's phone: "I'm back here, wya?" Detective Fry explained that "wya" was an acronym for "where you at." At 8:00 p.m., defendant's phone called Green's phone. Defendant's phone was just north of the Briarwood Apartments and moving closer. Green's phone remained in the Briarwood Apartments parking lot. Detective Fry could not place defendant's phone in the same area as Green's phone during the transaction because cell phone providers did not furnish location data for text messages like they did with phone calls. Finally, at 8:01 p.m., Green's phone called defendant's phone for five seconds, which likely indicated that it went to voicemail. Neither Green's phone nor the victim's phone was in Benton Heights during this trip.

Detective Fry testified that Green's and the victim's phones then travelled back to the Coloma/Watervliet area together. Thereafter, the victim's phone remained at his home; however, Green's phone left and later returned to the victim's home.

The medical examiner confirmed that the victim had three controlled substances in his system when he died. And the medical examiner concluded that fentanyl was a substantial cause of the victim's death.

The weight and strength of this untainted evidence convinces us that any error in admitting the similar-acts evidence was not outcome determinative because it did not undermine the reliability of the jury's verdict. *Denson*, 500 Mich at 409-410. See also *People v Whittaker*, 465 Mich 422; 635 NW2d 687 (2001). Simply put, any error in admitting the other-acts evidence was harmless. Defendant's and Green's phone records confirmed that Green and Woodman arranged for and obtained fentanyl from defendant, their long-term daily supplier. When Green and Woodman shared that fentanyl with the victim, he died. Accordingly, defendant is not entitled to a new trial.

## C. PHONE-RECORD EVIDENCE

Defendant next argues that the trial court improperly excluded a certain additional phone record because the evidence supported defendant's alternative-perpetrator defense. Further, defendant argues that defense counsel was ineffective for failing to argue additional stronger grounds for admitting the phone records, including: (1) the doctrine of curative admissibility, (2) admission under MRE 804(b)(3), or (3) the defendant's constitutional right to present a defense.

## 1. FACTUAL BACKGROUND

During direct examination of Berrien County Sheriff's Department Lieutenant Shawn Yech, the prosecutor asked if Woodman told him about whether she or Green were able to obtain any other drugs after their purchase from defendant. Defense counsel objected on hearsay grounds and the court sustained his objection. Thereafter, the following exchange occurred:

> [*The Prosecutor*]: You've heard [Woodman] testify that they didn't acquire any more drugs; is that correct?[16]
>
> [*Lt. Yech*]: That is correct.
>
> [*The Prosecutor*]: The only drugs they were able to get was from the Defendant; is that correct?
>
> [*Lt. Yech*]: That is correct.
>
> [*The Prosecutor*]: And based on the phone records were you able to confirm that?
>
> [*Lt. Yech*]: Yes.

On cross-examination, Lieutenant Yech agreed that defendant was not the county's only drug dealer. When Lieutenant Yech interviewed Woodman, he specifically inquired where the drugs came from that day and she said that they came from defendant. Lieutenant Yech did not question her about her suppliers but focused on where the victim had obtained the drugs that he used.

When defense counsel cross-examined Detective Fry, the law-enforcement expert in cellular record analysis, this exchange occurred:

> *Q.* . . . [D]o you recall where Mr. Green got in touch with a Jimmy Ferg?
>
> *A.* Yes.
>
> *Q.* And that was in the early morning hours of November 1st; is that correct?
>
> *A.* That is correct.
>
> *Q.* Okay. And do you recall that in that communication that Mr. –
>
> [The prosecutor]: Objection. Judge, can we approach?
>
> THE COURT: Okay. Sure.
>
> (At 11:28 a.m., bench conference off the record)
>
> (At 11:31 a.m., bench conference concluded)

---

[16] Woodman testified that during October 2020, she purchased fentanyl from "[p]robably two" individuals—defendant and her friend. Woodman also testified that defendant provided the fentanyl she, Green, and the victim used on November 1, 2020.

*Q.* All right. Detective Fry, you've indicated that you did review all of the incoming and outgoing phone calls of Matt Green; is that correct?

*A.* Yes, I went through his phone.

*Q.* The – from your experience in investigating these cases and analyzing them it was obvious to you that after any contact he had with Anthony Green he was making contact with other people as well. Isn't that correct?

*A.* Yes, he was putting feelers out there, trying to procure drugs that night.

*Q.* Okay. And from your observation or reviewing this did it become obviously [sic] to you that he did, in fact, obtain drugs from somebody else?

*A.* The only – the only evidence that I had in the phone was that he was able to successfully reach out to [defendant] to procure drugs that night.

*Q.* Isn't it also true that he was able to reach out to Jimmy Ferg?

*A.* Jimmy Ferg, there was a contact in the phone and communication, he was reaching out to him.

*Q.* About the possibility of obtaining of drugs [sic] is –

*A.* Trying to, but no confirmation as far as acknowledgment –

*Q.* Okay.

*A.* – in – in arranging a deal.

*Q.* All right. Is there anything indicating that Mr. Ferg, in fact, had some?

*A.* That's not – I don't – I don't recall that.

*Q.* Like a – a g, got half a – half a g of something?

*A.* I – I don't recall that.

*Q.* Well, is it possible that you just don't remember that?

*A.* Right. I believe that we ruled that out through witness statements and – and the like from that night.

*Q.* A witness – witness statement only being from Sidney Woodman. Correct? Who herself was [sic] claimed that she obtained the drugs from someone?

*A.* (Unintelligible) – I – I am not – I was not involved in those interviews.


Thereafter, defense counsel asked Detective Fry to look at the extraction report from Green's cell phone, which was examined by the Berrien County Sheriff's Department Detective Corey Peek. Detective Fry testified that the information contained in Detective Peek's extraction report contained the same information that he viewed on the victim's and Green's cell phones and that was made a part of Detective Fry's separate report based on his review of those phones. At that point, defense counsel moved to admit Detective Peek's 83-page extraction report. After a bench conference, the court reserved ruling on the issue.

Outside of the jury's presence, defense counsel later contended that the texts in the extraction report between Green and Ferg established another potential source for the fentanyl that ended the victim's life. The prosecution objected that the extraction report was hearsay. Defense counsel argued that Ferg's texts were admissible under MRE 801(d)(2)(E),[17] as a coconspirator's statement. The prosecutor responded that Green was not a party to this case. Defense counsel retorted that Green never purchased drugs from defendant. The prosecutor noted that Woodman testified that she and Green set up the transaction with defendant. The court then asked defense counsel how Ferg was a coconspirator and defense counsel responded that Ferg was a coconspirator under the same theory that the prosecutor sought to hold the supplier of the drugs liable in this case. The court said that it would rule on the matter after further review and argument.

When the parties returned to court, the prosecutor argued that there was no evidence of a conspiracy between defendant and Ferg. Moreover, as soon as the transaction with defendant took place at the Briarwood Apartments, any conspiracy ended and statements made thereafter were inadmissible. Defense counsel relied on his earlier argument, adding that Green's cell phone had already been admitted as an exhibit and that the extraction report was an easy way for the jury to view the exchange with Ferg rather than scrolling through actual texts on Green's phone. The prosecutor responded that the jury would not be allowed to take the cell phone back to the jury room, but would have to review it in the courtroom, where any hearsay contained therein could be addressed.[18] Thereafter, the court concluded that Detective Peek's extraction report for Green's cell phone was hearsay and declined to admit it.

In defendant's post-conviction motion, he sought a new trial, contending that trial counsel was ineffective for failing to argue that the extraction report was admissible: (1) under the doctrine of curative admissibility given Lieutenant Yech's testimony that the phone records confirmed that defendant was the only one who supplied drugs, (2) under MRE 804(b)(3), and (3) under the constitutional right to present a defense. The prosecution denied that defendant was entitled to a new trial. The trial court did not specifically address defendant's individual arguments, but denied his motion for a new trial because defendant presented the defense at trial that another person supplied the drugs.[19]

---

[17] A statement is not hearsay when it is offered against an opposing party and "was made by the party's coconspirator during and in furtherance of the conspiracy, if there is independent proof of the conspiracy." MRE 801(d)(2)(E).

[18] Given that the prosecution admitted Green's cell phone without reservation, we find the prosecutor's argument curious and note that the trial court sent the exhibits into the jury room except for the controlled substances and the videotape.

[19] In closing argument, defense counsel said:

> We did hear testimony that the officers agreed that – looked at the call records, that Mr. Green was calling around trying to locate drugs. And here I think is something that's very interesting. The only testimony that we hear about how this transaction went down is from Ms. Woodman herself. Ms. Woodman is a self[-]admitted drug addict. She told us that if she doesn't get her fix of Fentanyl within

an eight[-]hour period she becomes sick. She told us that the last time before her meeting up with Mr. Green and [the victim], the last time that she had taken Fentanyl was in the morning. And it might have even been the morning before, but I believe her testimony was that it was in the morning hours.

Certainly[,] more than eight hours between the morning that she took Fentanyl and when she allegedly purchased any Fentanyl from anybody at all. Hard for me to believe that an addict, once they had their hands on the drug of choice, would continue to wait another five, six hours before she ingested it.

I would suggest to you that it's very likely that wherever she got her drugs at 8 or 9 o'clock that evening, those drugs were consumed. And as officers testified that they'd looked at the calling records, Mr. Green was out looking for drugs after the 8 o'clock hour. So it's very likely that whatever [the victim] ingested at, I don't know, 2 o'clock in the morning, or later maybe, 5 o'clock, that that – those drugs came from some place other than any alleged rendezvous that occurred at the 8:00 p.m. hour. So I think that's an important gap, and it's something that needs to be considered as well.

Defense counsel also noted Woodman had a plea deal and that "she admitted that she had other sources for Fentanyl other than [defendant]." Counsel added:

[Woodman] often got her drugs from a friend, an unnamed friend, a [sic] one that as far as we know is still on the street selling drugs to other people, because she's protecting her friend. And she was protecting her friend in this particular case.

I think that there's a good possibility, one that creates reasonable doubt as to who she actually got those drugs from. She's the only one we heard from. Her – all the other testimony that you've heard, the only one that is saying my client supplied those drugs to somebody who supplied them to [the victim], is Ms. Woodman, who herself got a sweet deal. So you need to ask yourself whether the prosecutor has proven to you beyond a reasonable doubt that those drugs came from my client.

No proof, nobody saw the transaction. There's no proof of cell phone connections that indicate that my client ever met up with Mr. Green that night. And[,] therefore[,] I submit to you when an addict wants drugs, if they can't get it from one person they're going to get it from somebody else, and I suggest to you that that's what happened that night. After you've considered all of the evidence I ask you to come back with a verdict of not guilty on both of these counts.

-19-

## 2.  STANDARDS OF REVIEW

As stated earlier, this Court reviews "a trial court's decision to admit or exclude evidence for an abuse of discretion." *Hoskins*, 342 Mich App 194.

Whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). The trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Clear error exists when "the reviewing court is left with a definite and firm conviction that the trial court made a mistake. . . ." *People v Isrow*, 339 Mich App 522, 531; 984 NW2d 528 (2021) (quotation marks and citation omitted). Further, this Court review a trial court's decision on a motion for a new trial for an abuse of discretion. *People v Russell*, 297 Mich App 707, 715; 825 NW2d 623 (2012).

The United States and Michigan Constitutions guarantee the right to have the assistance of counsel in a criminal proceeding. US Const, Am VI; Const 1963, art 1, § 20. "[T]he right to counsel is the right to the effective assistance of counsel." *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984) (quotation marks and citation omitted). A defendant who claims ineffective assistance "must show that counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms." *Id*. at 688. The defendant must also show that there is a reasonable probability that, but for counsel's error, the result of the proceeding would have been different. *Id*. at 694. There is a "strong presumption that counsel's performance was born out of sound trial strategy." *Trakhtenberg*, 493 Mich at 52. "Counsel is not ineffective for failing to advance a meritless position or make a futile motion." *People v Henry (After Remand)*, 305 Mich App 127, 141; 854 NW2d 114 (2014).

## 3.  THE DOCTRINE OF CURATIVE ADMISSIBILITY

One published civil case in Michigan discusses the doctrine of "curative admissibility." See *Grist v The Upjohn Co*, 16 Mich App 462, 481-483; 168 NW2d 389 (1969). This doctrine applies when one party introduces evidence that might be inadmissible and it would be unfair to the opposing party to prevent him or her from developing the evidence regarding the same subject. *Id*. at 482-483, quoting 31A CJS Evidence §190, pp 509-512.

Defendant argues that Lieutenant Yech created a false impression when he testified that Woodman's testimony that the only drugs acquired were from defendant, which he confirmed based on the phone records. Lieutenant Yech did not create a false impression. Detective Fry confirmed that Green reached out to others to secure drugs. Woodman identified two suppliers that she used in October 2020. Defendant was Woodman's supplier at the Briarwood Apartments; her other supplier, who was unidentified, was in Benton Heights. On October 31, 2020, Woodman and Green, who were homeless, arranged to purchase fentanyl from defendant as confirmed by the record. And, although Detective Fry may not have recalled it, he testified that it was possible that

Ferg communicated to Green that Ferg had "half a g of something."[20]  Nevertheless, there was no evidence that a deal was completed between Green and Ferg or that Green and Woodman travelled to Benton Heights while they were with the victim.  Instead, Green's and defendant's phone records showed that they arranged a deal.  The cell phones belonging to Green, the victim, and defendant documented travel routes necessary to consummate the pre-arranged transaction with defendant, who was their dealer in the area of the Briarwood Apartments.  Green withdrew money to purchase one-half gram of fentanyl, which he gave to Woodman, who, in turn, exchanged money with defendant for the fentanyl.  Woodman took the fentanyl to Green, who put it in his pocket, where it stayed until they returned to the victim's home after they secured a needle so that Green could employ his preferred method for ingesting it.  On this record, there was no false impression, and *Grist* made clear that a court should not admit evidence under the curative admissibility doctrine " 'merely because the adverse party has brought out some evidence on the same subject, where the circumstances are such that no prejudice can result from a refusal to go into the matter further.' "  *Grist*, 16 Mich App at 483, quoting 31A CJS, Evidence, §190.

### 4.  STATEMENTS AGAINST PENAL INTEREST

MRE 804(b)(3) provides:

> **(b)  Hearsay Exceptions.**  The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> * * *
>
> (3) A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.  A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

---

[20] From defendant's redacted proposed exhibit, Ferg's instant message was "Like maybe a half g[.]"  Ferg's message followed a call and message from Green.  After receiving Ferg's message, Green again attempted to call Ferg, but it does not appear that he reached him.  Green then sent Ferg a message reading: "Ok iwant [sic] that for sure for sure ok im [sic] in bh[.]"  Ferg responded, messaging: "When u coming cause we're about to go to the casino[?]"  About fifty minutes later, Ferg twice called Green without success.  In the interim, Green repeatedly texted the victim, informing him that he would be there—at the victim's home—within a matter of minutes.

MRE 804(b) requires that the declarant be unavailable.[21] Under MRE 804(a), " '[u]navailability as a witness' includes situations in which the declarant—

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or

(2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or

(3) has a lack of memory of the subject matter of the declarant's testimony; or

(4) is unable to be present or testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means, and in a criminal case, due diligence is shown."

Defendant suggests that Ferg would be unavailable due to his potential criminal liability. But it is not enough to argue that Ferg would be unavailable by claiming Fifth Amendment privilege and refuse to testify; instead, defendant must offer proof that Ferg would have asserted his privilege if subpoenaed as a witness. See *People v Blankenship*, 108 Mich App 794, 797; 310 NW2d 880 (1981). On this record, defendant has not met his burden of demonstrating that Ferg was unavailable as a witness.

Second, as defendant correctly argues, "statements against penal interest are not limited to direct confessions." *People v Barrera*, 451 Mich 261, 270; 547 NW2d 280 (1996). "Moreover, it is well established that a particular piece of evidence need not by itself prove the declarant guilty." *Id*. at 270-271. "However, in order to be probative of the declarant's guilt, the statement must be against the declarant's interest in a real and tangible way." *Id*. at 271 (quotation marks and citations omitted). "If the declarant faces no reasonable threat of punishment, the justification underlying the exception would not be met." *Id*. at 272. Based on the calls and messages exchanged between Ferg and Green in the extraction report provided, there is a lack of evidence that Ferg was subject to any criminal liability.

Third, MRE 804(b)(3) requires that statements offered to exculpate a defendant must be trustworthy. "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." MRE 804(b)(3). Evidence was not presented that established Ferg was a drug supplier in the area that Green and Woodman were in on October 31 through November 1, 2020, or that Ferg actually possessed "like maybe half a g" of an unidentified

---

[21] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). This opinion relies on the version of the rules in effect at the time of defendant's 2021 trial.

substance that was one of the three controlled substances found to have contributed to the victim's death. Given this, the circumstances do not clearly indicate the trustworthiness of the statement.

### 5. THE CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE

The Due Process Clause of the Fourteenth Amendment requires that criminal defendants be afforded a meaningful opportunity to present a complete defense. US Const, Am XIV; Const 1963, art 1, §§ 13, 17, 20; *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984). But the right to present a defense is not absolute. *Hayes*, 421 Mich at 279. "The defendant must still comply with established rules and procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *People v Solloway*, 316 Mich App 174, 198; 891 NW2d 255 (2016) (quotation marks and citations omitted). "Accordingly, the right to present a defense extends only to relevant and admissible evidence." *Id.* (quotation marks and citation omitted). Even so, when "constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973).

In this case, defendant's argument that he was denied his right to present a defense is based on the trial court's preclusion of phone records extracted from Green's cell phone by Detective Peek. The trial court excluded the phone-record evidence because it was hearsay, MRE 801(c), a ruling that defendant does not contest on appeal. Instead, defendant proposed three alternative arguments that the phone-record evidence should have been admitted. For the reasons already discussed, defendant's first two alternative arguments are unavailing. Therefore, the exclusion of the inadmissible evidence did not interfere with defendant's right to present a defense. See *id*.

And, even without this extracted phone-record evidence, defendant was able to present evidence and argue that he was not the individual who provided the fentanyl that caused the victim's death. Defendant presented evidence of his theory of defense throughout the case, including during jury voir dire, opening statement, cross-examination of several witnesses, and closing argument. Accordingly, even though the trial court denied defendant's motion to admit the additional phone-record evidence, defendant was not deprived of a meaningful opportunity to present his alternative-perpetrator defense. See *People v Warner*, 339 Mich App 125, 149-150; 981 NW2d 733 (2021).

### 6. INEFFECTIVE ASSISTANCE OF COUNSEL

Because defendant's exhibit was inadmissible on the new grounds he has advanced, he has not met his burden of showing that his trial counsel performed deficiently. *Henry (Aft Rem)*, 305 Mich App at 141 ("Counsel is not ineffective for failing to advance a meritless position. . . ."). And, even if defendant could show that counsel had performed deficiently, given the compelling evidence presented during trial, he has not met his burden of showing that there was a reasonable probability of a different outcome. *Strickland*, 466 US at 694.

In sum, the trial court did not abuse its discretion when it denied defendant's request to admit the extracted phone-record evidence at trial. Nor was defense counsel ineffective for failing to present defendant's later-offered alternative arguments for its admission.

D. OVs 9 AND 13

Lastly, defendant argues that the trial court improperly assessed points for OV 9 and OV 13. We disagree.

Appellate courts review de novo whether the trial court properly interpreted and applied the sentencing guidelines. See *People v McGraw*, 484 Mich 120, 123; 771 NW2d 655 (2009). But appellate courts review for clear error a trial court's factual findings in support of a particular score under the sentencing guidelines. See *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). The trial court's factual findings underlying the scoring of a variable must be supported by a preponderance of the evidence. *Id.*

1. OV 9

At sentencing, the prosecution requested that the court assess 10 points for OV 9, MCL 777.39(1)(c) because "two to nine victims . . . were placed in danger of physical injury or death. . . ." The prosecution cited to *People v Fenderson*, unpublished per curiam opinion of the Court of Appeals, issued December 27, 2012 (Docket No. 306057), slip op at 1, 5,[22] where this Court affirmed a ten-point assessment in a situation where the purchaser delivered heroin to a third person, who ingested it and died.

Defense counsel objected and argued that the victim was "the only person that was under threat of physical injury" as Green and Woodman "exhibited no danger at all." Counsel added that the victim died because he had consumed methamphetamine before using the fentanyl. Therefore, he urged the court to assess zero points for OV 9.

The sentencing court remarked that the testimony showed that Woodman, Green, and the victim all shared the drugs. The prosecutor confirmed that all three shared the fentanyl and that Woodman and the victim shared the methamphetamine. Regardless, in the prosecutor's view, under *Fenderson*, "anyone who used the drug would be placed in danger." The sentencing court agreed.

On appeal, defendant contends that the victim died because of the combined effects of the drugs he consumed, including alprazolam. Because Woodman and Green did not consume the identical drugs, defendant asserts that they were not placed in danger.

When scoring OV 9, the court must count as a victim "each person who was placed in danger of physical injury or loss of life or property. . . ." MCL 777.39(2)(a). See also *People v Morson*, 471 Mich 248, 261-262; 685 NW2d 203 (2004). A victim must be a direct victim, rather than a member of the community indirectly affected by a crime. *People v Carrigan*, 297 Mich App 513, 515-516; 824 NW2d 283 (2012), abrogated in part *Hardy*, 494 Mich at 438 n 18. A victim does not have to actually suffer harm, as close proximity to a physically threatening situation may suffice. *People v Gratsch*, 299 Mich App 604, 623-624; 831 NW2d 462 (2013),

---

[22] Unpublished decisions are not binding, but may be considered for their persuasive value. *People v Swenor*, 336 Mich 550, 563 n 7; 971 NW2d 33 (2021).

judgment vacated in part on another ground 495 Mich 876 (2013). Only conduct related to the sentencing offense may be considered. *People v Sargent*, 481 Mich 346, 348; 750 NW2d 161 (2008).

In *Fenderson*, the victim purchased heroin from a couple, who had earlier purchased it from the defendant. *Fenderson*, unpub op. at 1. This Court upheld the trial court's assessment of 10 points for OV 9. *Id*. at 5. This Court reasoned that because heroin was "a harmful chemical substance capable of causing death," "the mere possession of heroin does place one in danger of physical injury or death." And, although it was true that one must ingest the heroin to be harmed, this Court determined that the "defendant's action of selling the heroin" to the buyers, provided all three of them "the opportunity and ability to ingest heroin, and therefore, they were placed in danger of physical injury or death during the transaction." *Id*.

In this case, Lieutenant Yech testified that fentanyl was far more potent than heroin and SWET investigated between twenty to twenty-five overdose deaths a year. All but one of those overdose deaths involved fentanyl. Furthermore, Lieutenant Yech testified that the manner in which cutting agents were added to fentanyl could affect its potency. Applying *Fenderson*'s rationale, which we find persuasive, the sentencing court did not err in assessing 10 points for OV 9.

## 2. OV 13

At sentencing, the prosecutor also requested that OV 13 be scored at 25 points for MCL 777.43(1)(c) because "[t]he offense was part of a pattern of felonious criminal activity involving 3 or more crimes against a person." The prosecutor asked the court to consider the delivery causing death as well as the driving while intoxicated causing death and leaving the scene of an accident causing death charges, recognizing that defendant had not been convicted of the latter offenses. Defense counsel objected that scoring OV 13 for an offense without a conviction was inappropriate. The sentencing court concluded that 25 points were properly assessed.

Determining the appropriate score under OV 13 requires the sentencing court to consider all crimes committed within a five-year period, including the sentencing offense, regardless of whether the offense resulted in a conviction. MCL 777.43(2)(a). Moreover, only those crimes that occurred within the five-year period encompassing the sentencing offense may be considered. *People v Francisco*, 474 Mich 82, 86; 711 NW2d 44 (2006).

In this case, OV 13 was assessed 25 points based on defendant's sentencing offense (delivery of a controlled substance causing death), MCL 750.317a, defendant's then-pending OWI-causing-death offense, MCL 257.625(4)(a), and defendant's then-pending failure-to-stop-at-an-accident-resulting-in-death-when-at-fault offense, MCL 257.617(3). All three of these offenses qualify as crimes against a person. MCL 777.12e, MCL 777.12f, and MCL 777.16p.

After his conviction, defendant filed a motion, which, in part, sought resentencing based on the trial court's scoring of OV 13 for a new reason. Defendant claimed that his subsequent convictions arose from a single act, and therefore, they could not constitute a pattern under OV 13. Defendant relied on *People v Carll*, 322 Mich App 690, 704-705; 915 NW2d 387 (2018), where this Court determined that MCL 777.43(1) required "more than one felonious event," and that if

there was a single act with multiple victims, evidence must be presented to show that the defendant committed separate acts against each individual victim. *Carll*, 322 Mich App at 705-706.

The trial court directed the prosecution to respond to defendant's motion. The prosecution contended that *Carll* was distinguishable and that the court could properly assess 25 points under OV 13 where a defendant committed distinct criminal acts in a single criminal episode. The prosecution relied on *People v Gibbs*, 299 Mich App 473, 487; 830 NW2d 821 (2013), and *People v Harmon*, 248 Mich App 522, 524; 640 NW2d 314 (2001). In *Gibbs*, the defendant was convicted of two counts of armed robbery and one count of unarmed robbery. *Gibbs*, 299 Mich App at 487. This Court explained that although "the robberies arose out of a single criminal episode, [the defendant] committed three separate acts against each of the three victims and these three distinct crimes constituted a pattern of criminal activity." *Id*. at 488. Likewise, in *People v Harmon*, 248 Mich App 522, 524; 640 NW2d 314 (2001), this Court concluded that the sentencing court did not err in assessing 25 points for OV 13 for four counts of making child sexually abusive material, arising from four photographs the defendant took on two separate occasions. *Id*. at 524, 532. Because defendant in this case committed separate criminal acts, the prosecutor contended that *Gibbs* and *Harmon*, not *Carll*, controlled.

At the hearing on defendant's motion, the trial court ruled that the convictions arising from the operating while intoxicated causing death and leaving the scene of an accident causing death were "multiple criminal acts [that arose] during a single episode." The sentencing court denied defendant's motion for resentencing because it had properly assessed 25 points for OV 13.

On appeal, defendant does not contend that his operating while intoxicated causing death charge and his failure to stop at an accident resulting in death convictions constituted separate criminal acts; instead, he challenges this Court's holding in *Gibbs*. This Court, however, is bound to follow its prior published decisions. See MCR 7.215(J)(1). Regardless, as the *Gibbs* panel observed, "although some subsections of MCL 777.43 contain limitations on a trial court's ability to score for more than one instance arising out of the same criminal episode, subsection (1)(c) contains no such limitation." *Gibbs*, 299 Mich App at 488. For example, MCL 777.43(2)(e) states: "Do not score more than 1 controlled substance offense arising out of the criminal episode for which the person is being sentenced." A rule of statutory construction provides that "[t]he omission of a provision in one part of a statute that is included in another part should be construed as intentional." *People v Belanger*, 227 Mich App 637, 646; 576 NW2d 703 (1998). Therefore, the Legislature authorized a sentencing court to score multiple felony criminal acts during a single episode for OV 13 under MCL 777.43(1)(c), and the sentencing court properly assessed 25 points for OV 13.

Affirmed.

/s/ Anica Letica
/s/ Stephen L. Borrello
/s/ Michelle M. Rick